**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ERMA ALDABA, as personal
representative and next of kin to Johnny
Manuel Leija, deceased,

     Plaintiff - Appellee,

v.

BRANDON PICKENS,

     Defendant – Appellant;


JAMES ATNIP; STEVE BEEBE,

     Defendants – Appellants,

and

THE BOARD OF MARSHALL COUNTY
COMMISSIONERS; THE CITY OF
MADILL;

     Defendants.

Nos. 13-7034 & 13-7035

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:12-CV-00085-FHS)**
_____

Clark Crapster, Steidley & Neal, Tulsa, Oklahoma, and Jordan L. Miller, Collins Zorn &
Wagner, Oklahoma City, Oklahoma (Eric D. Janzen and Philip W. Anderson, Collins
Zorn & Wagner, Oklahoma City, Oklahoma, on the briefs), for Defendant-Appellants
James Atnip and Steve Beebe.

Jeremy J. Beaver, Gotcher & Beaver Law Office, McAlester, Oklahoma, for Plaintiff-Appellee.

_____

Before **BRISCOE**, **McKAY**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

In *Aldaba v. Pickens*, 777 F.3d 1148 (10th Cir. 2015), this Court affirmed the district court's denial of summary judgment for three law-enforcement officers seeking qualified immunity. Relying on the facts that the district court applied to deny the summary-judgment motion, we concluded that a jury could find that the three officers had violated the Fourth Amendment by using excessive force, and that the law saying so was clearly established. *Id.* at 1161.

After the Supreme Court granted certiorari in *Pickens v. Aldaba*, 136 S. Ct. 479 (2015) (mem.), it vacated our judgment and remanded "for further consideration in light of *Mullenix v. Luna*, 577 U.S. ----, 136 S. Ct. 305 . . . (2015) (*per curiam*)." Having further considered our earlier opinion, we now hold that the three law-enforcement officers are entitled to qualified immunity because they did not violate clearly established law. We do not decide whether they acted with excessive force. Hence we reverse the district court's judgment and remand with instructions to grant summary judgment in favor of the three law-enforcement officers.

2

## I.     Mullenix v. Luna

In *Mullenix v. Luna*, Israel Leija Jr., fled a Texas police officer trying to arrest him on a warrant at a drive-in restaurant. 136 S. Ct. at 306. The officer pursued Leija, as did an officer in a different patrol car, at speeds up to 110 miles per hour on an interstate highway. *Id.* During the chase, Leija called police dispatch and threatened to shoot the officers unless they abandoned pursuit. *Id.* The dispatcher relayed this information over the police radio, also reporting that Leija might be intoxicated. *Id.* In response to the dispatch report, other officers began setting tire-spike strips at three highway locations. *Id.* The first location was beneath an overpass on Leija's route. *Id.* at 307. Though Trooper Mullenix arrived at the overpass too late to help set the tire spikes, he soon hatched another plan—disabling Leija's car by gunfire from the overpass. *Id.* Despite his supervisor's radio message to "stand by" to "see if the spikes work first," Trooper Mullenix steadied his rifle and awaited Leija. *Id.* About three minutes passed before Leija's car came into sight. *Id.* Trooper Mullenix fired six shots at the car, missing its engine block, radiator, and hood, but striking Leija four times. *Id.* Leija's car rolled into the tire spikes and flipped two and a half times. *Id.* Inside the car, Leija lay dead, killed by the rifle shots. *Id.*

Trooper Mullenix moved for summary judgment on qualified-immunity grounds, but the district court denied the motion. *Id.* It concluded that "[t]here are genuine issues of fact as to whether Trooper Mullenix acted recklessly, or acted as a reasonable, trained peace officer would have acted in the same or similar circumstances." *Id.* (alteration in original) (citing *Luna v. Mullenix*, Civil Action No.

2:12-CV-152-J, 2013 WL 4017124, at \*6 (N.D. Tex. Aug. 7, 2013)). Although the district court found a genuine issue of material fact about whether Leija had presented an immediate threat of physical harm or death to others, it did not further decide whether Trooper Mullenix had violated clearly established law governing excessive force. *Mullenix*, 2013 WL 4017124, at \*6.

After a panel affirmed the district court's decision, the Fifth Circuit denied en banc review. *Mullenix*, 136 S. Ct. at 308. Then the panel revised its opinion. Where it had earlier agreed with the district court that the "immediacy of the risk posed by Leija" was a fact question, it reversed course and declared that the objective reasonableness of Trooper Mullenix's acts instead presented a legal question. *Id.* at 307. Then, evaluating Trooper Mullenix's conduct as set out in the district court's order, the panel held that his actions were objectively unreasonable—and amounted to excessive force—"because several of the factors that had justified deadly force in previous cases were absent here: [t]here were no innocent bystanders, Leija's driving was relatively controlled, Mullenix had not first given the spike strips a chance to work, and Mullenix's decision was not a split-second judgment." *Id.* at 308. Almost in passing, the panel concluded that "the law was clearly established such that a reasonable officer would have known that the use of deadly force, absent a sufficiently substantial and immediate threat, violated the Fourth Amendment." *Id.* (quoting *Luna v. Mullenix*, 773 F.3d 712, 725 (5th Cir. 2014)).

Addressing only the clearly-established-law prong of the qualified-immunity analysis, the Supreme Court reversed. *Id.* It repeated its earlier direction to lower

4

courts that they not define clearly established law at a high level of generality. *Id.* In this regard, the Court again emphasized that "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Next, the Court emphasized that "[t]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Finally, the Court stressed that "specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The *Mullenix* Court rejected the rationale that the Fifth Circuit used to deny Trooper Mullenix qualified immunity. Specifically, the Supreme Court rejected the Fifth Circuit's using as clearly established law a general rule that "a police officer may not 'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.'" 136 S. Ct. at 308–09 (quoting *Luna*, 773 F.3d at 725). It harked back to *Brosseau*, where it had rejected as "mistaken" the Ninth Circuit's use of an equally general test for excessive force taken from *Tennessee v. Garner*, 471 U.S. 1 (1985), namely, that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a

5

threat of serious physical harm, either to the officer or to others." *Mullenix*, 136 S. Ct. at 309 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003)).

In repeating the proper rule for what qualifies as clearly established law, the *Mullenix* Court quoted its earlier cases. For instance, the Court restated what *Brosseau* had set as the correct inquiry in resolving whether the plaintiff had shown clearly established law—"whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [she] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 309 (alteration in original) (quoting *Brosseau*, 543 U.S. at 199–200). Highlighting that "this area is one in which the result depends very much on the facts of each case," the *Brosseau* Court found no clearly established law under which the officer's shooting was excessive force—"because '[n]one of [the cases] *squarely governs* the case here." *Id.* (alterations in original) (quoting *Brosseau*, 543 U.S. at 201).

Along the same line, the *Mullenix* Court found *Anderson v. Creighton*, 483 U.S. 635 (1987), "instructive on the required degree of specificity." *Mullenix*, 136 S. Ct. at 309. There, again, the Supreme Court had reversed denial of qualified immunity where the circuit court set as the clearly established law a general "right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances." *Id.* (quoting *Anderson*, 483 U.S. at 640). The Court "faulted that formulation for failing to address the actual question at issue: whether 'the circumstances with which Anderson was confronted . . .

6

constitute[d] probable cause and exigent circumstances.'" *Id.* (alteration in original) (quoting *Anderson*, 483 U.S. at 640–41).

Turning to Trooper Mullenix's case, the Court began by recounting the facts. In particular, it noted that "Mullenix confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at [the underpass]." *Id.* Next, as "the relevant inquiry," it asked "whether existing precedent placed the conclusion that Mullenix acted unreasonably in these circumstances 'beyond debate.'" *Id.* at 309 (quoting *al-Kidd*, 563 U.S. at 741). It declared that the Estate could not show clearly established law by relying on the "general principle that deadly force requires a sufficient threat." *Id.* In reviewing its precedents for a case that would show every reasonable official that it was "beyond debate" that Trooper Mullenix's conduct was excessive force, the Court noted the "hazy legal backdrop" in its excessive-force, car-chase cases. *Id.* It concluded that neither of its two high-speed-chase cases "squarely governed" under *Mullenix*'s facts. *Id.* at 310 (citing *Scott v. Harris*, 550 U.S. 372, 384 (2007) (holding that an officer did not violate the Fourth Amendment by ramming the car of a fugitive whose reckless driving "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase"); *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014) (holding that an officer acted reasonably when he fatally shot a fugitive who was "intent on resuming" a chase that "pose[d] a deadly threat for others on the road")).

7

We summarize by noting that the *Mullenix* Court rejected the Fifth Circuit's analysis applying Trooper Mullenix's acts against a general legal rule—that is, "a police officer may not 'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others'"—to meet the requirement of clearly established law. *Mullenix*, 136 S. Ct. at 308–09. Instead, though not requiring a case directly on point,[1] the Court looked to see if any case would make it clear to every reasonable official that Trooper Mullenix's actions would amount to excessive force in violation of the Fourth Amendment. *Id.* at 310. The Court found no case doing so. *Id.* In this regard, it cited key facts distinguishing Trooper Mullenix's case from earlier ones—"when Mullenix fired, he reasonably understood Leija to be a fugitive fleeing arrest, at speeds over 100 miles per hour, who was armed and possibly intoxicated, who had threatened to kill any officer he saw if the police did not

---

[1] The Estate relies heavily on *Hope v. Pelzer*, 536 U.S. 730, 739–40 (2002), which pronounced that law is clearly established if it gives officials "fair notice" or "fair warning" that "his conduct deprived his victim of a constitutional right." To show clearly established law, the *Hope* Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. This calls to mind our sliding-scale approach measuring the egregiousness of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012). But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312. We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730 (2002). As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions. In this regard, we note Justice Thomas's dissent in *Hope*, where he complains that the Court ignored *Malley v. Briggs*'s pronouncement that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Hope*, 536 U.S. at 752 (Thomas, J., dissenting) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In any event, the Supreme Court told us to apply *Mullenix*, so we do.

8

abandon their pursuit, and who was racing towards [another officer's] position." *Id.* at 312. The *Mullenix* Court concluded that none of its precedents "squarely governed" this situation. The precedents did not establish "beyond debate" that Mullenix had acted with excessive force. *Id.* at 310, 312. The *Mullenix* Court required more than an excessive-force finding insufficiently backed by existing precedent (choosing not to address whether the Fifth Circuit's excessive-force finding was correct). *Id.* at 308, 312.

## II.     Aldaba v. Pickens

In deciding whether the three law-enforcement officers in this case violated the Fourth Amendment by using excessive force, we must first review the facts that the district court relied upon to show excessive force. And after doing so, we must apply those facts against existing precedent to see whether every reasonable official would have known that those facts would "beyond debate" establish excessive force. *Id.* at 312.

### A.     Background

On March 24, 2011, at about 11:00 a.m., Johnny Manuel Leija was admitted to the Marshall County Medical Center in Madill, Oklahoma after feeling ill for several days. He was responsive, alert, and cooperative. Soon after his admission, doctors diagnosed dehydration and severe pneumonia in both lungs. To treat hypoxia—low oxygen levels caused by pneumonia—the hospital staff provided Leija intravenous antibiotics and breathing treatments to increase his oxygen-saturation level from 77%. The treatment worked—Leija's oxygen-saturation level began to rise.

9

But by 6:00 p.m., Leija's condition had turned for the worse. When a female nurse then visited Leija's room, she saw that he had cut his IV tube and disconnected his oxygen tubing. The nurse also saw that Leija's arms were bleeding and had left blood on the floor and toilet. When the nurse reconnected the IV and oxygen tube, Leija seemed confused and anxious, and he repeatedly asked for his girlfriend.

The nurse reported all this to Leija's treating doctor. In response, the doctor prescribed Xanax to control Leija's anxiety, but Leija refused to take it. Instead, he stood, again removed the oxygen tubing, and loudly accused the nurse of telling him lies and secrets. During this encounter, Leija became increasingly uncooperative and aggressive, shouting that the staff was trying to poison him. The nurse again sought the doctor's help. She told the doctor that Leija "refused the medicine, the agitation and confusion continued, and we may need assistance." Appellant's App. vol. I at 78. The nurse was concerned for her safety based on Leija's "yelling and his body language." *Id.* at 79. In response, the doctor sent a male nurse to Leija's room. When the male nurse arrived, he saw that Leija had again disconnected his IV and oxygen tubing, and he heard Leija yelling, "I am Superman. I am God. You are telling me lies and trying to kill me." *Id.* at 80. The male nurse could not calm Leija, or persuade him to return to bed. After advising the doctor of all this, the male nurse tried to inject Leija with Haldol and Ativan to calm him so the staff could reconnect the IV and oxygen tubing. But Leija still refused to cooperate, instead insisting that water alone was pure enough to help him.

Based on what he had seen and heard, the male nurse believed that, even together, he and the doctor could not restrain Leija sufficiently to inject the drugs. The doctor was concerned about Leija's low oxygen levels and his lack of IV and oxygen access. The male nurse believed that he and the doctor "could not manage [Leija's] safety and that we needed to contact law enforcement." *Id.* at 103. At 6:36 p.m., with the doctor's approval, the male nurse called law enforcement "for assistance with a disturbed patient." *Id.* at 106.

Soon after the call, the doctor arrived at Leija's room to assist the nurses. The doctor grew even more concerned for Leija's health after seeing his changed behavior and personality, and after hearing Leija claim that the staff was trying to poison him and that he was God and Superman. The doctor left Leija's room about when the responding officers arrived.

Madill Police Officer Brandon Pickens and Marshall County Sheriff Deputies James Atnip and Steve Beebe were eating dinner when Officer Pickens got a call asking that he assist the hospital medical staff. Deputies Atnip and Beebe went with him to the hospital. About when the officers arrived, Leija left his hospital room and began walking down the hallway toward the lobby and the hospital's exit. When Officer Pickens arrived, the doctor told him that "the man could not leave the hospital or he would die." Appellant's App. vol. II at 280. The three officers saw that Leija was agitated and upset. Officer Pickens tried to calm Leija and to persuade him to return to his room, but Leija refused, still insisting that the hospital was trying to kill him. Despite Officer Pickens's efforts, Leija resumed walking down the hallway

11

toward the lobby. Along the way, Leija stopped, "became angry, very angry," and pulled gauze and tape from his arms, causing a "fairly steady stream of blood out of each arm." *Id.* at 288–90. Leija then raised and shook his clenched fists, yelling, "this is my blood." *Id.* at 290, 372, 378–79. Facing this situation, Officer Pickens and Deputies Atnip and Beebe repeatedly ordered Leija to calm down and to get on his knees, but Leija refused, even after several warnings about using a Taser.

When Leija continued his behavior despite the warnings, Deputy Beebe aimed and fired his Taser[2] at Leija's torso, but one of the two probes missed. Almost immediately, Deputy Atnip grabbed Leija's right forearm and Officer Pickens grabbed Leija's left arm. Though they managed to get Leija face-first against a wall, Leija's strength kept the two officers from being able to move his arms to control him. To assist his fellow officers, Deputy Beebe tried to drive-stun Leija with the Taser, but nothing happened. During the ongoing struggle, Deputy Atnip managed to buckle Leija's knee, sending all four men to the floor.

During this entire encounter, medical personnel watched from nearby. As the officers began trying to handcuff Leija, the male nurse asked if he could inject Leija with the Haldol and Ativan, and the officers held Leija so the male nurse could do so. Almost immediately after the injection, Leija went limp, grunted, and vomited clear liquid. The officers moved away so the medical staff could begin CPR. Tragically,

---

[2] An officer can use a taser in one of two ways. First, the officer can use the taser in "drive-stun" mode, where the officer presses the taser's electrical nodes against a person's body. Second, the officer can fire metal darts (prongs) into the body. *See McKenney v. Harrison*, 635 F.3d 354, 363–64 (8th Cir. 2011) (Murphy, J., concurring).

their efforts to revive Leija failed, and at 7:29 p.m., he was pronounced dead. The medical examiner determined that Leija had died from respiratory insufficiency secondary to pneumonia and that Leija's exertion during the struggle with the officers "exacerbated his underlying pneumonia." *Id.* at 333.

## B.     No Violation of Clearly Established Law

*Mullenix* instructs us that the Fifth Circuit erred in its method of determining that Trooper Mullenix's conduct had violated clearly established law. In particular, the Fifth Circuit erred by concluding that the Estate's excessive-force claim would violate clearly established law if it "violated the clearly established rule that a police officer may not 'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.'" *Mullenix*, 136 S. Ct. at 308–09 (quoting *Luna*, 773 F.3d at 725).

We erred in a somewhat different way by relying on excessive-force cases markedly different from this one. Although we cited *Graham v. Conner*, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it. Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity. *Aldaba*, 777 F.3d at 1159. We also relied on several cases resolving excessive-force claims. But none of those cases remotely involved a situation as here: three law-enforcement officers responding to a distress

13

call from medical providers seeking help in controlling a disruptive, disoriented medical patient so they could provide him life-saving medical treatment.[3]

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 112 S. Ct. 2088, 2093 (2012)). Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, "existing precedent must have placed the statutory or constitutional question 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). "The dispositive question is 'whether the violative nature of the *particular conduct* is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742). In the Fourth Amendment context, "the result depends very much on the facts of each case," and the precedents must "squarely govern" the present case. *Id.* at 309 (quoting *Brosseau*, 543 U.S. at 201). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law." *Id.* at 308 (quoting *Malley*, 475 U.S. at 341).

Under these rules, the Estate cannot show that the officers violated clearly established law. As mentioned, the Estate's offered cases differ too much from this one, so reading them would not apprise every objectively reasonable officer that restraining Leija for medical treatment, as here, would amount to excessive force (and, again, we do not decide whether the officers acted with excessive force). The

---

[3] Nothing in this opinion authorizes police or hospital officials to use force to require a competent patient to receive medical treatment that person chooses not to have.

14

vast differences between the Estate's primary cases and this one are best seen by examining them individually.

First, the Estate relies on *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007). In that case, we reversed a grant of summary judgment based on qualified immunity. *Id.* at 1287. The police officers' actions in *Casey* were shocking and indefensible. Casey had challenged a traffic ticket and lost. *Id.* at 1279. After ruling, the judge gave Casey the case file to return to the cashier's window when he paid his fine. *Id.* Leaving his eight-year-old daughter in the restroom, Casey walked to his truck in the parking lot to get money to pay. *Id.* A court clerk had told Casey not to take the file outside, but he responded that he would be right back after getting his money. *Id.* As he returned with the court file and money, Officer Sweet intercepted him and ordered him back to his truck. *Id.* at 1280. Casey replied that he needed to return the file and attend to his daughter. *Id.*

When Casey stepped around the officer to return the file and pay his fine, Officer Sweet grabbed Casey's arm and put it in a painful arm lock. *Id.* As a confused Casey tried to get back to the courthouse, the officer jumped on his back. A second officer, Officer Lor, arrived and Tasered Casey. *Id.* As more officers arrived, officers took Casey to the ground, tightly handcuffed him, and repeatedly banged his face into the concrete. *Id.* With Casey lying on the ground, a third officer Tasered Casey by hand-pressing Taser barbs on Casey's body. *Id.* Next, Officer Lor again fired her Taser at Casey, accidentally striking a fellow officer. Then Officer Sweet told Officer Lor to "put the thing away." *Id.*

15

On appeal, we affirmed the denial of summary judgment to Officers Sweet and Lor, who had sought qualified immunity. *Id.* at 1283–84, 1286. We concluded that clearly established law showed that the two officers' had acted with excessive force. *Id.* at 1284. In doing so, we relied on the fair-notice test from *Hope v. Pelzer*. *Id.* We then applied our sliding-scale analysis to the officers' egregious tackling and Tasering of a peaceful citizen without warning or explanation. *Id.* at 1285. In addition, we relied on *Graham v. Connor* as "establish[ing] that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Id.* at 1285–86 (quoting *Graham*, 490 U.S. at 396).

Second, the Estate relies on *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010). In that case, police responded to a nonemergency domestic-violence call. *Id.* at 662. They learned that Shannon Cavanaugh had earlier consumed alcohol and pain medication and had also tried to force her husband into a closet during a fight. *Id.* at 663. Soon afterward, she had left the house, carrying a kitchen knife. *Id.* While the officers were there, a neighbor saw Shannon returning home with empty hands. *Id.* As Shannon approached her home, she saw an officer walking down the driveway. She cut across her front lawn toward her home. *Id.* The officer followed about six feet behind her. *Id.* After she stepped onto the home's front steps, the officer—without warning—fired his Taser into her back. *Id.* She "went rigid, spun around, and struck her head on the concrete steps," causing a traumatic brain injury. *Id.*

16

In deciding whether the officers' conduct was "objectively reasonable in light of the facts and circumstances confronting them," we looked again to *Graham*, particularly its direction that we "careful[ly] balance . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Cavanaugh*, 625 F.3d at 664 (alteration in original) (first quoting *Graham*, 490 U.S. at 396; and then quoting *Casey*, 509 F.3d at 1281). In particular, we looked to "whether the officer's use of force was reasonable given the severity of the suspected crime, the immediate threat to the officer or others, and whether the suspect was actively resisting arrest or evading arrest by flight." *Id.* at 664 (citing *Graham*, 490 U.S. at 396). With this in mind, we concluded that the officer's conduct was objectively unreasonable. Applying the *Graham* factors, we saw a minor crime, if any, no immediate threat to the officer or anyone else, and no active resisting or evading arrest. *Id.* at 665. Next, relying on *Casey*, we decided that clearly established law showed a Fourth Amendment violation. We found it sufficient that *Casey* had presented "very similar factual circumstances: a police officer used her Taser against a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands." *Id.* at 665–66 (citing *Casey*, 509 F.3d at 1281–82).

Third, the Estate relies on *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001). There, police responded to a report that a man was running around naked. *Id.* at 1185. Police called for an ambulance after seeing the naked man on an apartment building's outside landing. The man was yelling and kicking his legs up and down.

17

*Id.* The officers coaxed the man to the ground, but he then tried to walk past them. *Id.* The officers wrestled him face-down to the ground and handcuffed him. *Id.* To stop his kicking, the officers wrapped a nylon restraint around his ankles. *Id.* The officers may have "hog-tied" him—by wrapping his ankles within a foot of his wrists. *Id.* Before an ambulance arrived, Cruz's face blanched, leading the officers to remove the restraint. *Id.* Despite the emergency crew's CPR efforts, Cruz died. *Id.* His autopsy revealed a large amount of cocaine in his system. *Id.*

On appeal, we noted that our circuit had not yet ruled on the constitutionality of hog-tie restraints. *Id.* at 1188. We held that officers "may not apply this technique when an individual's diminished capacity is apparent." *Id.* Although we found cases outside our circuit prohibiting hog-tying, we could not say that "a rule prohibiting such a restraint in this situation was 'clearly established' at the time of this unfortunate incident." *Id.* at 1189.

None of these three cases would advise "every reasonable official" that Tasering Leija to hasten life-saving care would amount to excessive force under the Fourth Amendment. Here, the three law-enforcement officers were not arresting Leija. Instead, they were assisting his medical providers, who needed to control him so they could provide emergency care. Leija was beyond reason and if allowed to leave the hospital would face death—so said his doctor. Unlike the officers in the three cases above, the law-enforcement officers here tried to calm Leija and Tasered him only after their other efforts had failed. Undoubtedly, they faced a difficult situation, and no nearby medical provider advised against using the Taser. We have

18

found no case presenting a similar situation. We certainly cannot say that every reasonable officer would know that the Fourth Amendment condemned using a Taser to avoid a full-out physical confrontation with a patient whose life depended on immediate treatment. No case renders a Fourth Amendment violation "beyond debate."

Finally, the Estate relies on a line of cases in which plaintiffs alleged that law-enforcement officers had used excessive force against persons suffering from mental illness or diminished capacity. As with the above cases, these cases did not involve medical providers standing nearby while officers used a Taser to subdue a person temporarily out of his mind and needing life-assisting medical treatment. Instead, these additional cases involve force used to detain persons for non-medical reasons. With this key difference in mind, we cannot say that clearly established law informed the officers that their actions would violate the Fourth Amendment. *See Giannetti v. City of Stillwater*, 216 F. App'x 756 (10th Cir. 2007) (concluding officers did not act with excessive force in death of a physically combative, bipolar woman detained on a misdemeanor traffic offense after they forcefully held her to the floor while readying her to wear jail clothing, despite her repeatedly advising that she couldn't breathe and that her lungs were collapsing); *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) (concluding that the Estate had raised a genuine issue of material fact about excessive force in the death of a combative, disoriented pedestrian in view of conflicting evidence about whether the officer had applied undue pressure to the prone man's back in a joint effort with other officers to handcuff him); *Champion v.*

19

*Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (denying qualified immunity to officers when the evidence in the surviving family's favor showed that as officers lay atop an autistic man—whom they knew to be "mentally ill or retarded"—they continued to pepper spray him in the face after he had stopped resisting arrest and was not a flight risk); *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) (denying qualified immunity to an officer who, without warning, had fired a lead-filled bag from a shotgun into the face of an emotionally disturbed man— destroying one eye and leaving lead in his skull—when the man had complied with officers' orders despite being verbally abusive).

As with the Estate's other cases, none of these additional cases would inform the three officers "beyond debate" that their actions would be excessive force. Again, the officers here were acting to restrain Leija so that his medical providers—standing by observing—could administer life-saving care. The three officers' conduct is nothing like that exhibited in the cited cases. Certainly, none of those cases squarely governs this one. And nothing suggests that the three law-enforcement officers were plainly incompetent or knowingly violated the law.

## III.  Conclusion

Accordingly, we remand this case with instructions that the district court grant summary judgment in favor of the three officers based on qualified immunity.