PHILLIPS, J., dissenting.
*1151 I would conclude that the four deputy sheriffs did not act with excessive force under the Fourth Amendment, and, accordingly, that they violated no clearly established law. For this dissent, I focus on the majority's analysis of the clearly-established-law prong of qualified immunity.
In evaluating the issues, we must always remember that the four deputies were responding to a woman's emergency call reporting domestic violence. Law-enforcement officers know that domestic-violence calls present safety risks. Physical violence is still in the air, and a domestic-violence suspect can reasonably expect to be taken into custody. Almost immediately after arriving at this inherently dangerous scene, the deputies encountered the domestic-violence suspect, Ryan Lee. He was intoxicated, verbally confrontational, and generally belligerent. Dealing with such unpleasantness is an expected part of an officer's job. But the law makes plain that officers need not let unpleasantness escalate into conduct that endangers the safety of themselves and others.
A. Qualified Immunity: General Policies
"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established ... constitutional rights of which a reasonable person would have known.' " Mullenix v. Luna , --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (quoting Pearson v. Callahan , 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ). Qualified immunity "balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson , 555 U.S. at 231, 129 S.Ct. 808. The doctrine " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " Hunter v. Bryant , 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting Malley v. Briggs , 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ). "The qualified immunity analysis thus is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question." Hernandez v. Mesa , --- U.S. ----, 137 S.Ct. 2003, 2007, 198 L.Ed.2d 625 (2017) (quoting White v. Pauly , --- U.S. ----, 137 S.Ct. 548, 550, 196 L.Ed.2d 463 (2017) (per curiam) ).
"This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." Hunter , 502 U.S. at 229, 112 S.Ct. 534 (quoting Davis v. Scherer , 468 U.S. 183, 196, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ). Qualified immunity is available "to ensure that fear of liability will not 'unduly inhibit officials in the discharge of their duties.' " Camreta v. Greene , 563 U.S. 692, 705, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (quoting Anderson v. Creighton , 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ).
The Supreme Court has repeatedly stressed the importance of early review of qualified-immunity defenses. " Harlow [v. Fitzgerald , 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ] and Mitchell make clear that the defense is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery ..., as '[i]nquiries of this kind can be peculiarly disruptive of effective government.' " Behrens v. Pelletier , 516 U.S. 299, 308, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (alterations in original) (quoting Mitchell v. Forsyth , 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ). "The *1152 privilege is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' " Saucier v. Katz , 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting Mitchell , 472 U.S. at 526, 105 S.Ct. 2806 ), receded from on other grounds by Pearson , 555 U.S. at 236, 129 S.Ct. 808.
B. Qualified Immunity: Fourth Amendment
"Fourth Amendment reasonableness 'is predominantly an objective inquiry.' " Ashcroft v. al-Kidd , 563 U.S. 731, 736, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (quoting City of Indianapolis v. Edmond , 531 U.S. 32, 47, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) ). We inquire whether "the circumstances, viewed objectively, justify [the challenged] action." Id. (alteration in original) (quoting Scott v. United States , 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) ). If the action was justified objectively, it is reasonable whatever the officer's subjective intent. Id. (quoting Whren v. United States , 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ). Qualified immunity shields officers from suits for damages if "a reasonable officer could have believed [the challenged conduct] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." Hunter , 502 U.S. at 227, 112 S.Ct. 534 (second alteration in original) (quoting Anderson , 483 U.S. at 641, 107 S.Ct. 3034 ). A court "should ask whether the [officers] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed ... years after the fact." Id. at 228, 112 S.Ct. 534.
C. Qualified Immunity: Summary Judgment
"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." Medina v. Cram , 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." Morris v. Noe , 672 F.3d 1185, 1191 (10th Cir. 2012) (quoting Martinez v. Beggs , 563 F.3d 1082, 1088 (10th Cir. 2009) ). In determining what material facts are genuinely in dispute, the district court construes the evidence in the light most favorable to the nonmovant. Weigel v. Broad , 544 F.3d 1143, 1151 (10th Cir. 2008).
D. The Material Facts as Found by the District Court
In a July 3, 2017 Memorandum Opinion and Order, Magistrate Judge Nina Y. Wang[1] set out a section of "material facts" as follows:
The events giving rise to Plaintiff' [sic] Complaint occurred on the night of July 4, 2014, when Defendants arrived at Plaintiff's residence in response to a 911 call placed by Plaintiff's wife Tamila Lee. Earlier that day, Mr. Lee attended a barbeque where he consumed approximately 4-5 alcoholic beverages. The Parties dispute whether Plaintiff was "overly intoxicated." Upon returning home from the barbeque, Plaintiff and Ms. Lee argued, and eventually "wrestled," over a set of car keys, because Ms. Lee was concerned that Plaintiff was too intoxicated *1153 to drive. The Parties dispute the severity and characterization of the altercation between Mr. and Ms. Lee; regardless, it is undisputed that: (1) Ms. Lee blocked Mr. Lee from exiting their residence; (2) Ms. Lee attempted to grab the car keys from Plaintiff's hand and the two began to struggle over the keys; (3) Plaintiff and Ms. Lee fell to the ground and continued to struggle for possession of the car keys; (4) Plaintiff threw the car keys which then struck Ms. Lee's leg; and (5) both Plaintiff and Ms. Lee suffered minor injuries (e.g., cuts and abrasions) because of the altercation.
Ms. Lee then called 911. During that call, Ms. Lee informed the 911operator [sic] that she did not know how much Plaintiff had to drink that day, that Plaintiff had thrown car keys at her, and that Plaintiff was "going to get on the phone and tell the operator that she (Tamila) [was] crazy." During the call, Ms. Lee also informed the 911 operator that she and Plaintiff had been fighting. Plaintiff then took the phone from Ms. Lee and told the operator that there was "nothing going on;" that he had not consumed much more alcohol than Ms. Lee; that Ms. Lee hits and abuses him (including with weapons) and that he can show the officers proof of physical abuse; that he never threw the car keys at Ms. Lee; and that the officers will see that "somebody is crazy and somebody isn't." Plaintiff then stated, "Jesus Christ. F*k. I'm getting off the phone, bye." At that time, Plaintiff was aware that "police officers were either coming or already outside[.]"
Defendants O'Harold and Tucker arrived at Plaintiff's residence first-both at some point heard yelling from inside Plaintiff's residence-and, upon knocking on Plaintiff's door, Ms. Lee answered and consented to their entry. Defendant O'Harold informed Plaintiff that he was there to investigate a domestic disturbance complaint; Plaintiff, standing in the living room, said, "Get the f*k out." Plaintiff also demanded to see a warrant authorizing their entry, to which either Defendant O'Harold or Tucker responded, "what are you some kind of lawyer or something." Mr. Lee replied, "no, but you don't look like a lawyer either, you look like a dumba**."
Then, Defendants Walker and Weiss arrived at Plaintiff's residence and separated Plaintiff and Ms. Lee. When questioned by Defendants Walker and Weiss, Ms. Lee stated that Plaintiff was intoxicated, had been arrested for driving under the influence in the past, had pinned her to the ground so she bit him, had shoved but not hit her,[2] that the two were arguing over the car keys, that the argument continued in the parking lot where the two continued to push one another, and that she cut her thumb and had bruises from the walls. Plaintiff, however, initially refused to answer Defendants O'Harold and Tucker's questions (including the cause of abrasions on Plaintiff's arm), apparently exercising his right to remain silent but, in doing so, Plaintiff employed "profane language;" however, Plaintiff eventually told Defendants O'Harold and Tucker that he and Ms. Lee were arguing but that he "never laid a hand on her."
Following the respective interviews, Defendants O'Harold and Weiss convened outside the front door of Plaintiff's residence to discuss the information gleaned from Plaintiff and Ms. Lee. Mr. Lee remained in the living room with Defendant Tucker, and Ms. Lee *1154 remained in a bedroom with Defendant Walker. Defendants contend that Defendants O'Harold and Weiss concluded that they had probable cause to arrest Mr. Lee pursuant to Colo. Rev. Stat. § 18-6-803.6.[3] Plaintiff disagrees, contending that the conversation between Defendants O'Harold and Weiss was very brief and was interrupted by Defendant Tucker's yelling. The interruption occurred because Plaintiff turned to Defendant Tucker and stated, "F*cking idiot," before arising from the couch and allegedly announcing his intention to get a glass of water from the kitchen. The Parties also dispute whether: (1) Mr. Lee actually announced his intention to get a drink of water; (2) Mr. Lee was aware that he was being arrested or detained and could not move freely about his residence; or (3) upon arising from the couch, Defendant Tucker asked and/or ordered Plaintiff to stay seated and away from the kitchen due to a perceived risk of harm. Nonetheless, Plaintiff stated "something to the effect of 'its [sic] my house,' and/or 'I can go in my own kitchen," [sic] and continued in the direction of the kitchen.
As Plaintiff continued toward the kitchen, Defendant Tucker attempted to detain Plaintiff, but was unsuccessful in doing so and a struggle ensued. Defendants O'Harold and Weiss, upon hearing the confrontation between Defendant Tucker and Plaintiff, entered Plaintiff's residence and observed the struggle. At this point, Defendant O'Harold grabbed Plaintiff and applied an "arm bar hold" in an attempt to subdue Plaintiff, causing Mr. Lee to collide with his kitchen cabinets and refrigerator. Then, Defendant Weiss entered the struggle, delivering two "hammer strikes" to Plaintiff's shoulder in an attempt to loosen his grip on the refrigerator; Defendant O'Harold also struck Plaintiff's neck with a "hammer strike." Because Defendants O'Harold, Tucker, and Weiss could not subdue Plaintiff, Defendant Tucker drew his Taser and administered approximately 3-5 "drive stuns" to Plaintiff's back, lasting roughly 3, 5, and 8 seconds.[4] During oral argument, counsel for Defendants conceded that "drive stuns" was not synonymous with Taser contacts; a single drive stun could include multiple contacts with Plaintiff's person. At some point, Plaintiff lost consciousness and it is alleged that Defendant Weiss twice informed Plaintiff that he was under arrest but nevertheless resisted.[5] Defendant Walker allegedly observed the struggle but did not intervene.
*1155 Ultimately, Defendant Weiss handcuffed Mr. Lee, and Defendants escorted Plaintiff to the rear seat of Defendant Weiss' squad car where Plaintiff stated Ms. Lee was "out of control and was 'being a c**t.' "
Defendant O'Harold remained on the scene with Ms. Lee, who allegedly completed a Douglas County Sheriff's Office Domestic Violence Victim Statement Form, while Defendants Weiss and Walker transported Mr. Lee to Castle Rock Adventist Hospital (the "hospital") for jail clearance. During his transport to the hospital, Plaintiff informed Defendants Weiss and Walker that his handcuffs were too tight but to no avail, and that if Defendant Tucker did not have a badge or a Taser Plaintiff "could have kicked his a**."
J.A. vol. 16 at 458-63 (alterations in original) (citations omitted).
E. The Majority's Reasoning
The majority correctly begins by assembling the facts to which Lee is entitled as the nonmovant on summary judgment and running them through the qualified-immunity analysis. At the end of that process, as noted, we must determine whether the deputies' conduct was objectively reasonable, and, if not, whether that was "beyond debate" with a "squarely governing" precedent clearly establishing that the officer's actions amounted to excessive force under the Fourth Amendment. The majority affirms the denial of qualified immunity. I challenge two major underpinnings of its conclusion.
First, I address the majority's statement about whether Deputy Tucker told Lee not to enter the kitchen. The majority believes that the district court found a fact dispute about whether Deputy "Tucker ordered [Lee] to stay seated or move away from the kitchen due to the perceived risk of harm present from the knives in the kitchen." Maj. op. at 1148. Presumably, the majority relies on the portion of the district court's order finding a fact dispute about whether "upon [Lee's] arising from the couch, [Deputy] Tucker asked and/or ordered [Lee] to stay seated and away from the kitchen due to a perceived risk of harm ." J.A. vol. 16 at 461 (emphasis added). As the italicized language shows, this district-court finding goes to whether Deputy Tucker told Lee why he was ordering him not to enter the kitchen (remembering that Deputy Tucker had few seconds to speak from the time Lee moved from the couch to the kitchen archway).[6] But the district court found that Deputy Tucker had in fact told Lee not to go into the kitchen. The district court found that Deputy Tucker had warned, "Don't go in the kitchen," and later noted, "Defendant Tucker requested that Plaintiff not go in the kitchen." Id. at 480, 487.
The district court was right to find that Deputy Tucker told Lee not to go into the kitchen. For starters, Lee testified that after he announced that he was getting a drink of water, "[t]he officer yelled at me as I was taking the steps towards the kitchen archway." Id. vol. 5 at 136:14-15. According to Lee, the officer's words were "to the effect" of "[d]o not go in the kitchen." Id. at 139:6-7. To this, Lee replied with words "to the effect" of, "It's my kitchen, or, It's my house; I can go in my kitchen." Id. at 139:11-13. Further, Lee's response brief to this court acknowledges this verbal exchange. See Br. of Appellee at 6-7.
*1156 Second, the majority adopts the district court's finding of a fact dispute about whether Lee resisted the deputies as they tried to handcuff him. Having done so, the majority rules that the deputies could not repeatedly apply the Taser without warning when Lee "was not resisting the officers and had not been advised that he was being detained." Maj. op. at 1150. But to evaluate whether we could correctly say that Lee was not resisting, it helps to review exactly what the district court did and did not say.
The district court certainly did not say that Lee was complying with the officers' attempts to handcuff him. Lee could have complied simply by placing his hands behind his back. And the district court acknowledged that Lee's failure to do so "suggest[ed] that Mr. Lee was non-compliant and resisting arrest." J.A. vol. 17 at 481. But still the district court found a fact issue about whether Lee had "actively resisted" the deputies-apparently meaning whether Lee had "punch[ed], kick[ed], push[ed], or shov[ed]" the deputies during the struggle. Id. vol. 16 at 480. The district court decided that a jury could find that Lee didn't resist the deputies so long as it believed Lee's account that he "never fought back or actively resisted the officers." Id. vol. 17 at 481. Unmentioned in the majority opinion is the district court's finding that, as Lee sat in the patrol car, Lee announced that had Deputy Tucker not had a badge or Taser, Lee "could have kicked his a**." Id. vol. 16 at 463. Also unmentioned is Lee's admitting in his deposition that he might indeed have said that. Id. vol. 5 at 142:23-43:5. Lee's combative words in the patrol car help show the difficult situation that the deputies faced-as officers responding in an objectively reasonable way-in trying to handcuff him.
The district court's findings show that Lee physically struggled with the deputies to avoid being handcuffed. To handcuff Lee, the officers needed to break his grip on the refrigerator handle. The district court's distinction between "actively" versus "passively" resisting dissolves into nothing. To the deputies, any talk about whether Lee resisted must seem laughable. Lee's fighting to keep his hands in front of his body qualifies as resistance. Lee could resist without biting, scratching, punching, pinching, kicking, shoving, or the like.
F. Clearly Established Law
Under the second prong of the qualified-immunity analysis, each deputy would be entitled to summary judgment unless Lee showed that the deputy "violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." Plumhoff v. Rickard , 572 U.S. 765, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) (quoting al-Kidd, 563 U.S. at 735, 131 S.Ct. 2074 ). "And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Id . at 2023 (citing al-Kidd , 131 S.Ct. at 2083-84 ). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.' " District of Columbia v. Wesby , --- U.S. ----, 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018) (quoting Malley , 475 U.S. at 341, 106 S.Ct. 1092 ). Though the Supreme Court's caselaw " 'do[es] not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.' " White , 137 S.Ct. at 551 (alteration in original) (quoting Mullenix , 136 S.Ct. at 308 ).
"[S]pecificity is especially important in the Fourth Amendment context, where the *1157 Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix , 136 S.Ct. at 308 (quoting Saucier , 533 U.S. at 205, 121 S.Ct. 2151 ). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." Kisela v. Hughes , --- U.S. ----, 138 S.Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (quoting Mullenix , 136 S.Ct. at 309 ). "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " Wesby , 138 S.Ct. at 590 (quoting Saucier , 533 U.S. at 202, 121 S.Ct. 2151 ).
G. The Majority's Decision on the Clearly-Established-Law Prong
As I understand the majority, it concludes that the deputies all violated the Fourth Amendment because a deputy "repeatedly appli[ed] a Taser without warning, despite the fact that Lee was not resisting the officers and had not been advised that he was being detained." Maj. op. at 1150. I understand the majority to base its excessive-force conclusion on the unwarned repeated Taserings.
As mentioned, the district court concluded that a jury could find that Lee had not resisted if the jury believed that Lee was not "actively resisting" the deputies by assaulting them as they attempted to handcuff him. As a legal matter, the district court concluded that resisting requires assaultive behavior, not simply precipitating a lengthy physical struggle to avoid being handcuffed. I disagree with the majority's characterizing this inquiry as one of fact. Further, even if we assume that a jury could find that Lee was not resisting being handcuffed, we would still need to determine as a legal matter whether the deputies' conduct was objectively reasonable. In the circumstances of this case, no reasonable deputy would suspect that Lee might not be resisting as they physically strained to handcuff him.
Separately, I believe that the district court's findings defeat the majority's view that the repeated Taserings were unrelated to any resistance by Lee. The district court found that "[b]ecause Defendants O'Harold, Tucker, and Weiss could not subdue Plaintiff, Defendant Tucker drew his Taser and administered approximately 3-5 'drive stuns' to Plaintiff's back, lasting roughly 3, 5, and 8 seconds." J.A. vol. 16 at 462 (emphasis added). I cannot see how Deputy Tucker's resorting to Tasering Lee to subdue him after other efforts failed would be objectively unreasonable. Would all but plainly incompetent officers know Deputy Tucker's Tasering was excessive force? To prevail on the clearly-established-law prong of qualified immunity, Lee must provide precedent that "squarely governs" the case and puts the answer to the excessive-force question "beyond debate" to show that the deputies' conduct was objectively unreasonable and amounted to excessive force.
As the requisite clearly established law, the majority relies on just one case- Cavanaugh v. Woods Cross City , 625 F.3d 661 (10th Cir. 2010). Maj. op. at 1149. It declares this case "sufficiently analogous" to Lee's to satisfy his burden. Id. So Lee's overcoming qualified immunity depends on whether Cavanaugh provides clearly established law advising all law-enforcement officers that under the circumstances of this case, Tasering Lee would be excessive force.
In Cavanaugh , Mr. Cavanaugh called police about a non-emergency. Id. at 662. He sought help finding his wife, who had stormed out of the house after a domestic *1158 dispute. Id. Mr. Cavanaugh told the officers that his wife had tried to force him into a closet during a fight and that she had earlier consumed alcohol and pain medication. Id. at 662-63. He advised the officers that his wife had left the home, carrying a kitchen knife. Id. at 663. While the officers were at the house, a neighbor saw Ms. Cavanaugh returning home with empty hands. Id. In front of her home, Ms. Cavanaugh approached an officer walking toward her. Id. She cut across her front lawn toward her home. Id. The officer followed about six feet behind her. Id. Ms. Cavanaugh neither acted aggressively toward the officer nor threatened him. Id. at 665. Yet as she stepped onto the home's front steps, the officer-without warning-fired his Taser into her back. Id. at 663 ; see also id. at 665. She "went rigid, spun around, and struck her head on the concrete steps," causing a traumatic brain injury. Id. at 663.
We looked to "whether the officer's use of force was reasonable given the severity of the suspected crime, the immediate threat to the officer or others, and whether the suspect was actively resisting arrest or evading arrest by flight." Id. at 664 (citing Graham v. Connor , 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ). In doing so, we concluded that the officer was investigating a minor crime, if any; that Ms. Cavanaugh presented no immediate threat to the officer or anyone else; and that Ms. Cavanaugh had neither actively resisted nor evaded arrest. Id. at 665. From those conclusions, we determined that a jury could conclude that the officer had acted with excessive force. Id. at 666.
Turning to the clearly-established-law prong, we reviewed our precedent of Casey v. City of Federal Heights , 509 F.3d 1278 (10th Cir. 2007). Cavanaugh , 625 F.3d at 666-67. We found it sufficient that Casey had presented "very similar factual circumstances: a police officer used her Taser against a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands." Id. at 666 (citing Casey , 509 F.3d at 1281-82 ).
I cannot see how Cavanaugh squarely governs Lee's case. Unlike the officer in Cavanaugh , the deputies here were locked in a physical struggle with Lee and had exhausted other efforts to handcuff him before Deputy Tucker used a Taser. Unlike the unsuspecting Ms. Cavanaugh, Lee had every reason to believe that the longer he succeeded in resisting the handcuffing, the more likely a deputy would use a Taser. Unlike what happened to Ms. Cavanaugh, Lee's body was not penetrated by fired prongs that left him limp and subject to a brain injury upon falling and hitting concrete steps.
The more appropriate case in guiding our decision on the clearly-established-law prong is Aldaba v. Pickens (Aldaba II ), 844 F.3d 870 (10th Cir. 2016). In that case, law-enforcement officers were called to a hospital "for assistance with a disturbed patient." Id. at 875. When the officers arrived, they found Johnny Leija walking down the hallway. Id. The officers tried to calm him, but he was not in his right mind, claiming that the hospital was trying to kill him. Id. After Leija pulled gauze from his arms, a "fairly steady stream of blood" began to flow from each arm. Id. The officers ordered Leija to calm down and to get on his knees. Id. at 876. Leija refused to do so, even after the officers warned him several times about using a Taser. Id. Ultimately, one officer fired a Taser, but just one of the two probes struck Leija. Id. Almost immediately after this, the officers physically struggled with Leija, with one officer unsuccessfully trying to use the Taser's drive-stun function to subdue Leija. Id. Finally, one officer buckled Leija's knee, sending him and three officers to the *1159 floor. Id. Almost immediately after that, medical personnel injected Leija with sedatives. Id. Within seconds, Leija went limp, grunted, and vomited. Id. The officers moved away so medical staff could administer CPR. Id. This effort failed to revive Leija, and he was soon pronounced dead. Id.
Though a year earlier we ruled that the officers had violated Leija's clearly established Fourth Amendment rights, see Aldaba v. Pickens (Aldaba I ), 777 F.3d 1148 (10th Cir.), vacated , --- U.S. ----, 136 S. Ct. 479, 193 L.Ed.2d 347 (2015) (mem.), we reversed ourselves on our initial clearly-established-law ruling after the Supreme Court vacated that judgment and remanded for our consideration in light of Mullenix . See Aldaba II , 844 F.3d at 871. The second time around, we rejected the argument that Cavanaugh had provided the necessary clearly established law to overcome qualified immunity. Id. at 878, 879.
If Cavanaugh cannot provide clearly established law sufficient to rule that Tasering a disturbed hospital patient is not excessive force, I don't see how the majority can reach a different result for Deputy Tucker's Tasering Lee during a physical struggle after other efforts to subdue Lee for handcuffing him failed. Though Aldaba II was decided two years after Lee's arrest, it surveyed all preceding cases in concluding that no precedent clearly established that all but plainly incompetent officers, or officers knowingly violating the law, would act with excessive force under the Fourth Amendment in Tasering a disturbed hospital patient. The same conclusion should apply for the deputies here in their Tasering an intoxicated, belligerent suspected wife-abuser, ending a dangerous physical struggle by handcuffing him.[7]

At the outset of the case, the parties consented to the Magistrate Judge deciding this case.

Here, the order includes a footnote stating, "Plaintiff denies that Ms. Lee told Defendants Walker and Weiss that Plaintiff pushed her to the ground." J.A. vol. 16 at 460 n.3.

Here, the order includes a footnote stating,
Section 18-6-803.6(1) provides, in pertinent part, "[w]hen a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence, as defined in section 18-6-800.3(1), has been committed, the officer shall, without undue delay, arrest the person suspected of its commission ... and charge the person with the appropriate crime or offense." There is no requirement to arrest either party involved should the peace officer(s) determine that no probable cause exists to believe a crime or offense of domestic violence has been committed.
J.A. vol. 16 at 461 n.4 (alterations in original) (citations omitted).

Here, the order includes a footnote stating,
A drive (or "dry") stun means that the Taser's prongs were never developed; rather, the Taser would make an "electric arc that would stun when touched to the skin." In addition, Plaintiff alleges that Douglas County "trains its officers to use the Taser for five-second durations. ... [B]ut an officer may continue holding the trigger down for an extended, longer discharge."
J.A. vol. 16 at 462 n.5 (alterations in original) (citations omitted).

We read this sentence to mean that the Plaintiff (not Defendant Weiss) "nevertheless resisted."

Along this same line, Lee argues that Deputy Tucker didn't communicate to him Deputy Tucker's "subjective, unreasonable belief" that "the kitchen was a dangerous place." Br. of Appellee at 7. If it matters, Ms. Lee testified that the block of knives was to the left of the stove. J.A. vol. 5 at 130:16-18.

The majority distinguishes Aldaba II on grounds that the law-enforcement officers there warned Leija they would use a Taser unless he submitted. Maj. op. at 1150 n.1. But we must remember that Leija was out of his right mind and in poor shape even to understand a warning. 844 F.3d at 874-76. And even if the majority could dismiss Aldaba II , the majority's opinion still lacks a "squarely governing" precedent establishing "beyond debate" that Deputy Tucker's Tasering Lee mid-struggle was objectively unreasonable, after the three deputies had been unable to physically subdue him. As spelled out above, the Tasering in Cavanaugh involved far different facts.