**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 24, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RYAN LEE,

     Plaintiff - Appellee,

v.

TODD TUCKER; MARK O'HAROLD;
AMANDA WEISS; CHAD WALKER,

     Defendants - Appellants.

No. 17-1236

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CV-01569-NYW)**
_____

Raymond K. Bryant, Civil Rights Litigation Group, PLLC, Denver, Colorado, for
Plaintiff-Appellee.

S. Kelly Dunnaway, Office of the County Attorney, Douglas County, Colorado, Castle
Rock, Colorado (Christopher K. Pratt, Office of the County Attorney, Douglas County,
Colorado, Castle Rock, Colorado, with him on the briefs), for Defendants-Appellants.
_____

Before **LUCERO**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**LUCERO**, Circuit Judge.
_____

     Ryan Lee sued four Douglas County Sheriff's Deputies, pursuant to 42 U.S.C.

§ 1983, alleging violations of his First and Fourth Amendment rights. The

defendants moved for summary judgment, arguing that Lee's rights were not

violated, and even if his rights were violated, that they were entitled to qualified immunity. The district court granted the defendants' motion in part and denied it in part, concluding that there was "a genuine issue of material fact as to whether excessive force was used" and that the defendants were not entitled to qualified immunity. Defendants now appeal from the denial of qualified immunity.

We lack interlocutory appellate jurisdiction to review the district court's determination of evidentiary sufficiency at the summary judgment stage. Ralston v. Cannon, 884 F.3d 1060, 1062 (10th Cir. 2018). As to the purely legal challenge defendants raise on appeal, we conclude that the district court correctly held that—based on the relevant version of the facts—the defendants used excessive force and did so in violation of clearly established law. We accordingly dismiss the appeal as to the factual challenges, and exercising jurisdiction under 28 U.S.C. § 1291, we otherwise affirm the district court's order.

## I

On July 4, 2014, Lee and his wife, Tamila Lee, attended a barbecue where they consumed alcohol. After the couple returned home, an altercation broke out over a set of car keys. Tamila, in an attempt to keep her husband from driving, blocked him from exiting their home, and a physical struggle ensued. She called 911 and informed the operator that her husband had been drinking and they had been fighting. Lee then took the phone from her and told the operator that nothing was happening and that Tamila regularly physically abuses him. Defendants, all of whom are

employed by the Douglas County Sheriff's Office, were promptly dispatched to the Lees' home.

Mark O'Harold and Todd Tucker arrived first and entered the home with Tamila's consent. Lee asked to see a warrant, and one of the deputies responded: "What are you, some kind of lawyer or something?" Lee responded, "No, but you don't look like a lawyer either, you look like a dumbass." Shortly afterward, Deputies Amanda Weiss and Chad Walker also arrived at the Lees' home and separated the Lees for questioning. Lee was largely uncooperative. Tamila reported that the couple had been arguing over car keys, that Lee was intoxicated, that he had previously been arrested for driving under the influence, and that he had pinned her to the ground and shoved her.

After gathering information from both spouses, O'Harold and Weiss stepped outside to discuss what they had learned, while Tucker remained in the living room with Lee, and Walker remained in the bedroom with Tamila. While O'Harold and Weiss were outside, Lee swore at Tucker again, stood up from the sofa and moved toward the kitchen. The parties dispute whether Lee announced that he intended to get a glass of water, whether he had been arrested or detained at this point, and whether Tucker ordered him to stay seated or move away from the kitchen due to the perceived risk of harm present from the knives in the kitchen.

As Lee nonetheless moved toward the kitchen, Tucker attempted to detain him, and another struggle broke out. O'Harold and Weiss, hearing a commotion, reentered the home. O'Harold applied an arm bar hold to Lee. Lee collided with the

3

kitchen cabinets and refrigerator, and Weiss then struck him twice in the shoulder in an effort to force him to let go of the refrigerator. O'Harold also struck Lee twice in the neck. Tucker drew his Taser and applied it three to five times to Lee's back, with each application lasting approximately three, five, and eight seconds respectively. Lee then lost consciousness. Throughout the incident, Walker observed but did not intervene. Weiss then handcuffed Lee and escorted him to Weiss' squad car. Lee subsequently pled guilty to violating Colo. Rev. Stat. § 18-9-111(1)(a), a misdemeanor domestic violence crime.

Following these events, Lee filed suit, alleging First Amendment retaliation and excessive force. Defendants moved for summary judgment on the basis of qualified immunity. The district court granted the motion as to Lee's First Amendment retaliation claim and the portion of his excessive force claim based on handcuffing, but denied it as to the remainder of his excessive force claim. The district court concluded that the facts remaining in dispute, when viewed in the light most favorable to Lee, precluded a grant of qualified immunity. Defendants now appeal.

## II

On appeal, defendants argue that the district court erred, both in finding a violation of a constitutional right and in concluding that the law was clearly established at the time they acted. See Mick v. Brewer, 76 F.3d 1127 (10th Cir. 1996) (to overcome qualified immunity, a plaintiff must show: "(1) that the defendant's actions violated a constitutional or statutory right, and (2) that the right

4

allegedly violated was clearly established at the time of the conduct at issue"

(quotation and alteration omitted)). As to the first prong, they argue that the district

court erred in its application of the test from Graham v. Connor, 490 U.S. 386 (1989),

to determine whether the force the deputies used was excessive. In assessing whether

force was reasonable, courts consider "the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. In

particular, the defendants argue that the district court erred in concluding that the

offense for which Lee was arrested was relatively minor, that Lee did not pose an

immediate threat to the safety of the deputies or others, and that he did not actively

resist arrest or attempt to flee.

Denial of summary judgment is generally not immediately appealable.

Roosevelt-Hennix v. Prickett, 717 F.3d 751, 753 (10th Cir. 2013). However, we

possess jurisdiction "over a subset of appeals from the denial of qualified immunity

at the summary judgment stage." Id. We have jurisdiction "to review (1) whether

the facts that the district court ruled a reasonable jury could find would suffice to

show a legal violation, or (2) whether that law was clearly established at the time of

the alleged violation." Id. We do not have jurisdiction to consider whether "the

pretrial record sets forth a genuine issue of fact for trial." Id. Instead, we generally

must accept the facts specified by the district court "even if our own de novo review

of the record might suggest otherwise as a matter of law." Id. (italics omitted).

5

Under these standards, we lack jurisdiction to review the defendants' arguments, adopted by the dissent, that Lee posed an immediate threat and that he actively resisted arrest or attempted to flee. In this case, the district court "conclude[d] that these disputed facts are indeed material, and it is for the jury to decide whether Mr. Lee resisted." Consideration of challenges to this conclusion would "require [us to] second-guess[] the district court's determinations of evidence sufficiency" and would accordingly exceed our interlocutory jurisdiction. Henderson v. Glanz, 813 F.3d 938, 948 (10th Cir. 2015). We therefore dismiss the appeal as to these issues.

### III

We do, however, have jurisdiction to review whether the facts as the district court found them would constitute a legal violation. Roosevelt-Hennix, 717 F.3d at 753. Accordingly, we consider the defendants' argument that the district court erred in concluding that the first Graham factor—the severity of the crime at issue— weighed in Lee's favor. We review the district court's qualified immunity determination at the summary judgment stage de novo. Mick, 76 F.3d at 1134.

The district court concluded that, because the deputies responded to a call regarding a potential misdemeanor, "the amount of force should be reduced accordingly." Although the court explicitly noted that it did not intend to "diminish[] the seriousness of domestic violence," the defendants argue that the court essentially did so. We disagree. The district court's analysis was consistent with the many cases in which we have held that the first Graham factor may weigh against the use

6

of significant force if the crime at issue is a misdemeanor. See, e.g., Morris v. Noe, 672 F.3d 1185, 1195 (10th Cir. 2012); Koch v. City of Del City, 660 F.3d 1228, 1247 (10th Cir. 2011); Fogarty v. Gallegos, 523 F.3d 1147, 1160 (10th Cir. 2008).

We decline to hold, as the defendants would have us do, that all calls to police involving allegations of domestic violence entitle officers to respond with substantial force. Given that the defendants' remaining challenges to the district court's application of Graham amount to factual challenges over which we have no jurisdiction, we must accept the district court's ruling that a jury could find that Lee did not pose an immediate threat and was not attempting to evade arrest. Under these circumstances, the fact that the crime at issue involves domestic violence does not entitle the arresting officers to use significant force. See Cavanaugh v. Woods Cross City, 625 F.3d 661, 667 (10th Cir. 2010). We therefore hold that the district court did not err in concluding that Lee established a violation of a constitutional right.

Defendants also argue that, even if Lee's constitutional rights were violated, those rights were not clearly established. The district court relied on three cases in rejecting this argument: Perea v. Baca, 817 F.3d 1198 (10th Cir. 2016), Cavanaugh, and Casey v. City of Federal Heights, 509 F.3d 1278 (10th Cir. 2007). We conclude that Cavanaugh was sufficiently analogous to the scenario at issue in this case. In that case, a man called police for help finding his wife, who had stormed off after a fight. 625 F.3d at 662-63. He told officers that she had been drinking, had taken pain medication, attempted to put him in a closet during their fight, and left home with a kitchen knife. Id. at 663. An officer quickly found her outside the home. Id.

7

Although he could see that her hands were empty, he drew his Taser and discharged it into her back without warning. Id. We concluded the law was clearly established that an officer may not use a "Taser against a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands." Id. at 667.[1]

Although defendants attempt to distinguish Cavanaugh from this case, their efforts amount to further impermissible challenges to the district court's factual recitation. For example, defendants seek to distinguish Cavanaugh by arguing that the officers told Lee not to enter the kitchen. However, the district court concluded that Lee sufficiently established the defendants never advised Lee that he was being detained and was not free to move about the house.[2] Defendants further assert that,

---

[1] The warning about the imminent use of force issued by the officers and subsequent opportunity for the misdemeanant to comply distinguish Aldaba v. Pickens, 844 F.3d 870 (10th Cir. 2016), upon which the dissent relies, from Cavanaugh and this case. In Aldaba, officers "repeatedly ordered [the individual] to calm down and get on his knees, but [he] refused, even after several warnings about using a Taser." 844 F.3d at 876. But as recognized in Cavanaugh and controlling in this case, the law is "clearly established" that an officer cannot "use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning." 625 F.3d at 667 (emphasis added).

[2] The dissent emphasizes the district court's statement that Tucker told Lee not to enter the kitchen. (See Dissenting Op. 8-9.) However, the district court found a material dispute as to whether Lee had been detained at the time he walked toward the kitchen. As the district court noted, Tucker testified that Lee was not detained at that time. The district court's finding therefore refutes any suggestion that Lee's actions evinced an attempt to evade or resist arrest. See United States v. Hernandez, 93 F.3d 1493, 1499 (10th Cir. 1996) (providing the "correct test" to establish detention "is whether a reasonable person in [the detained individual's] position would believe he was not free to leave"). Further, Tucker's order that Lee should stay out of the kitchen does not shield defendants from clearly established law that

8

unlike in Cavanaugh, the violence in this case "was ongoing when the deputies arrived." This assertion is also unsupported by the district court's evidentiary conclusions, which are beyond our jurisdiction to review. Finally, the defendants argue that Cavanaugh's facts are meaningfully different from those in this case, because in that case "there was no perceived danger that the officer was trying to prevent." In contrast, in this case, Lee was approaching the kitchen, where knives were stored. In Cavanaugh, however, the officer subjectively believed that the woman was armed with a knife, even if it was not in her hands at the time he found her.

Cavanaugh establishes that the use of a Taser without warning on a non-resisting misdemeanant violates the Fourth Amendment's excessive force protections. Under the facts articulated by the district court, defendants violated Cavanaugh's dictate by repeatedly applying a Taser without warning, despite the fact that Lee was not resisting the officers and had not been advised that he was being detained. Although defendants seek to argue that Lee was in fact resisting their efforts to arrest him, we have no jurisdiction to review the district court's evidentiary conclusions.

## IV

For the foregoing reasons, we **DISMISS** the appeal as to factual challenges, and otherwise **AFFIRM** the district court's order.

---

requires a warning prior to the use of force under circumstances involving a "nonviolent misdemeanant who [does not] pose a threat and [is not] resisting or evading arrest." Cavanaugh, 625 F.3d at 667.

*Lee v. Tucker*, No. 17-1236

**PHILLIPS**, J., dissenting.

I would conclude that the four deputy sheriffs did not act with excessive force under the Fourth Amendment, and, accordingly, that they violated no clearly established law. For this dissent, I focus on the majority's analysis of the clearly-established-law prong of qualified immunity.

In evaluating the issues, we must always remember that the four deputies were responding to a woman's emergency call reporting domestic violence. Law-enforcement officers know that domestic-violence calls present safety risks. Physical violence is still in the air, and a domestic-violence suspect can reasonably expect to be taken into custody. Almost immediately after arriving at this inherently dangerous scene, the deputies encountered the domestic-violence suspect, Ryan Lee. He was intoxicated, verbally confrontational, and generally belligerent. Dealing with such unpleasantness is an expected part of an officer's job. But the law makes plain that officers need not let unpleasantness escalate into conduct that endangers the safety of themselves and others.

## A. Qualified Immunity: General Policies

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. The doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). "The qualified immunity analysis thus is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam)).

"This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Hunter*, 502 U.S. at 229 (quoting *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). Qualified immunity is available "to ensure that fear of liability will not 'unduly inhibit officials in the discharge of their duties.'" *Camreta v. Greene*, 563 U.S. 692, 705 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

The Supreme Court has repeatedly stressed the importance of early review of qualified-immunity defenses. "*Harlow* and *Mitchell* make clear that the defense is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery . . . , as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'" *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (alterations in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "The privilege is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to

2

trial.'" *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (quoting *Mitchell*, 472 U.S. at 526), *receded from on other grounds by Pearson*, 555 U.S. at 236.

## B. Qualified Immunity: Fourth Amendment

"Fourth Amendment reasonableness 'is predominantly an objective inquiry.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)). We inquire whether "the circumstances, viewed objectively, justify [the challenged] action." *Id.* (alteration in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). If the action was justified objectively, it is reasonable whatever the officer's subjective intent. *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)). Qualified immunity shields officers from suits for damages if "a reasonable officer could have believed [the challenged conduct] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Hunter*, 502 U.S. at 227 (second alteration in original) (quoting *Anderson*, 483 U.S. at 641). A court "should ask whether the [officers] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . years after the fact." *Id.* at 228.

## C. Qualified Immunity: Summary Judgment

"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the

constitutional right was clearly established." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th

Cir. 2012) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)). In

determining what material facts are genuinely in dispute, the district court construes the

evidence in the light most favorable to the nonmovant. *Weigel v. Broad*, 544 F.3d 1143,

1151 (10th Cir. 2008).

## D. The Material Facts as Found by the District Court

In a July 3, 2017 Memorandum Opinion and Order, Magistrate Judge Nina Y.

Wang[1] set out a section of "material facts" as follows:

> The events giving rise to Plaintiff' [sic] Complaint occurred on the night of July 4, 2014, when Defendants arrived at Plaintiff's residence in response to a 911 call placed by Plaintiff's wife Tamila Lee. Earlier that day, Mr. Lee attended a barbeque where he consumed approximately 4-5 alcoholic beverages. The Parties dispute whether Plaintiff was "overly intoxicated." Upon returning home from the barbeque, Plaintiff and Ms. Lee argued, and eventually "wrestled," over a set of car keys, because Ms. Lee was concerned that Plaintiff was too intoxicated to drive. The Parties dispute the severity and characterization of the altercation between Mr. and Ms. Lee; regardless, it is undisputed that: (1) Ms. Lee blocked Mr. Lee from exiting their residence; (2) Ms. Lee attempted to grab the car keys from Plaintiff's hand and the two began to struggle over the keys; (3) Plaintiff and Ms. Lee fell to the ground and continued to struggle for possession of the car keys; (4) Plaintiff threw the car keys which then struck Ms. Lee's leg; and (5) both Plaintiff and Ms. Lee suffered minor injuries (e.g., cuts and abrasions) because of the altercation.

> Ms. Lee then called 911. During that call, Ms. Lee informed the 911operator [sic] that she did not know how much Plaintiff had to drink that day, that Plaintiff had thrown car keys at her, and that Plaintiff was "going to get on the phone and tell the operator that she (Tamila) [was] crazy." During the call, Ms. Lee also informed the 911 operator that she and Plaintiff had been fighting. Plaintiff then took the phone from Ms. Lee and told the operator that there was "nothing going on;" that he had not

---

[1] At the outset of the case, the parties consented to the Magistrate Judge deciding this case.

consumed much more alcohol than Ms. Lee; that Ms. Lee hits and abuses him (including with weapons) and that he can show the officers proof of physical abuse; that he never threw the car keys at Ms. Lee; and that the officers will see that "somebody is crazy and somebody isn't." Plaintiff then stated, "Jesus Christ. F*k. I'm getting off the phone, bye." At that time, Plaintiff was aware that "police officers were either coming or already outside[.]"

Defendants O'Harold and Tucker arrived at Plaintiff's residence first—both at some point heard yelling from inside Plaintiff's residence—and, upon knocking on Plaintiff's door, Ms. Lee answered and consented to their entry. Defendant O'Harold informed Plaintiff that he was there to investigate a domestic disturbance complaint; Plaintiff, standing in the living room, said, "Get the f*k out." Plaintiff also demanded to see a warrant authorizing their entry, to which either Defendant O'Harold or Tucker responded, "what are you some kind of lawyer or something." Mr. Lee replied, "no, but you don't look like a lawyer either, you look like a dumba**."

Then, Defendants Walker and Weiss arrived at Plaintiff's residence and separated Plaintiff and Ms. Lee. When questioned by Defendants Walker and Weiss, Ms. Lee stated that Plaintiff was intoxicated, had been arrested for driving under the influence in the past, had pinned her to the ground so she bit him, had shoved but not hit her,[2] that the two were arguing over the car keys, that the argument continued in the parking lot where the two continued to push one another, and that she cut her thumb and had bruises from the walls. Plaintiff, however, initially refused to answer Defendants O'Harold and Tucker's questions (including the cause of abrasions on Plaintiff's arm), apparently exercising his right to remain silent but, in doing so, Plaintiff employed "profane language;" however, Plaintiff eventually told Defendants O'Harold and Tucker that he and Ms. Lee were arguing but that he "never laid a hand on her."

Following the respective interviews, Defendants O'Harold and Weiss convened outside the front door of Plaintiff's residence to discuss the information gleaned from Plaintiff and Ms. Lee. Mr. Lee remained in the living room with Defendant Tucker, and Ms. Lee remained in a bedroom with Defendant Walker. Defendants contend that Defendants O'Harold and Weiss concluded that they had probable cause to arrest Mr. Lee pursuant to

---

[2] Here, the order includes a footnote stating, "Plaintiff denies that Ms. Lee told Defendants Walker and Weiss that Plaintiff pushed her to the ground." J.A. vol. 16 at 460 n.3.

5

Colo. Rev. Stat. § 18-6-803.6.[3] Plaintiff disagrees, contending that the conversation between Defendants O'Harold and Weiss was very brief and was interrupted by Defendant Tucker's yelling. The interruption occurred because Plaintiff turned to Defendant Tucker and stated, "F*cking idiot," before arising from the couch and allegedly announcing his intention to get a glass of water from the kitchen. The Parties also dispute whether: (1) Mr. Lee actually announced his intention to get a drink of water; (2) Mr. Lee was aware that he was being arrested or detained and could not move freely about his residence; or (3) upon arising from the couch, Defendant Tucker asked and/or ordered Plaintiff to stay seated and away from the kitchen due to a perceived risk of harm. Nonetheless, Plaintiff stated "something to the effect of 'its [sic] my house,' and/or 'I can go in my own kitchen," [sic] and continued in the direction of the kitchen.

As Plaintiff continued toward the kitchen, Defendant Tucker attempted to detain Plaintiff, but was unsuccessful in doing so and a struggle ensued. Defendants O'Harold and Weiss, upon hearing the confrontation between Defendant Tucker and Plaintiff, entered Plaintiff's residence and observed the struggle. At this point, Defendant O'Harold grabbed Plaintiff and applied an "arm bar hold" in an attempt to subdue Plaintiff, causing Mr. Lee to collide with his kitchen cabinets and refrigerator. Then, Defendant Weiss entered the struggle, delivering two "hammer strikes" to Plaintiff's shoulder in an attempt to loosen his grip on the refrigerator; Defendant O'Harold also struck Plaintiff's neck with a "hammer strike." Because Defendants O'Harold, Tucker, and Weiss could not subdue Plaintiff, Defendant Tucker drew his Taser and administered approximately 3-5 "drive stuns" to Plaintiff's back, lasting roughly 3, 5, and 8 seconds.[4] During oral argument, counsel for Defendants conceded

---

[3] Here, the order includes a footnote stating,
Section 18-6-803.6(1) provides, in pertinent part, "[w]hen a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence, as defined in section 18-6-800.3(1), has been committed, the officer shall, without undue delay, arrest the person suspected of its commission . . . and charge the person with the appropriate crime or offense." There is no requirement to arrest either party involved should the peace officer(s) determine that no probable cause exists to believe a crime or offense of domestic violence has been committed.
J.A. vol. 16 at 461 n.4 (alterations in original) (citations omitted).

[4] Here, the order includes a footnote stating,
A drive (or "dry") stun means that the Taser's prongs were never developed; rather, the Taser would make an "electric arc that would stun

that "drive stuns" was not synonymous with Taser contacts; a single drive stun could include multiple contacts with Plaintiff's person. At some point, Plaintiff lost consciousness and it is alleged that Defendant Weiss twice informed Plaintiff that he was under arrest but nevertheless resisted.[5] Defendant Walker allegedly observed the struggle but did not intervene. Ultimately, Defendant Weiss handcuffed Mr. Lee, and Defendants escorted Plaintiff to the rear seat of Defendant Weiss' squad car where Plaintiff stated Ms. Lee was "out of control and was 'being a c**t.'"

Defendant O'Harold remained on the scene with Ms. Lee, who allegedly completed a Douglas County Sheriff's Office Domestic Violence Victim Statement Form, while Defendants Weiss and Walker transported Mr. Lee to Castle Rock Adventist Hospital (the "hospital") for jail clearance. During his transport to the hospital, Plaintiff informed Defendants Weiss and Walker that his handcuffs were too tight but to no avail, and that if Defendant Tucker did not have a badge or a Taser Plaintiff "could have kicked his a**."

J.A. vol. 16 at 458–63 (alterations in original) (citations omitted).

## E. The Majority's Reasoning

The majority correctly begins by assembling the facts to which Lee is entitled as the nonmovant on summary judgment and running them through the qualified-immunity analysis. At the end of that process, as noted, we must determine whether the deputies' conduct was objectively reasonable, and, if not, whether that was "beyond debate" with a "squarely governing" precedent clearly establishing that the officer's actions amounted to

---

when touched to the skin." In addition, Plaintiff alleges that Douglas County "trains its officers to use the Taser for five-second durations. . . . [B]ut an officer may continue holding the trigger down for an extended, longer discharge."
J.A. vol. 16 at 462 n.5 (alterations in original) (citations omitted).

[5] We read this sentence to mean that the Plaintiff (not Defendant Weiss) "nevertheless resisted."

excessive force under the Fourth Amendment. The majority affirms the denial of qualified immunity. I challenge two major underpinnings of its conclusion.

First, I address the majority's statement about whether Deputy Tucker told Lee not to enter the kitchen. The majority believes that the district court found a fact dispute about whether Deputy "Tucker ordered [Lee] to stay seated or move away from the kitchen due to the perceived risk of harm present from the knives in the kitchen." Maj. op. at 3. Presumably, the majority relies on the portion of the district court's order finding a fact dispute about whether "upon [Lee's] arising from the couch, [Deputy] Tucker asked and/or ordered [Lee] to stay seated and away from the kitchen *due to a perceived risk of harm*." J.A. vol. 16 at 461 (emphasis added). As the italicized language shows, this district-court finding goes to whether Deputy Tucker told Lee *why* he was ordering him not to enter the kitchen (remembering that Deputy Tucker had few seconds to speak from the time Lee moved from the couch to the kitchen archway).[6] But the district court found that Deputy Tucker *had in fact* told Lee not to go into the kitchen. The district court found that Deputy Tucker had warned, "Don't go in the kitchen," and later noted, "Defendant Tucker requested that Plaintiff not go in the kitchen." *Id.* at 480, 487.

The district court was right to find that Deputy Tucker told Lee not to go into the kitchen. For starters, Lee testified that after he announced that he was getting a drink of water, "[t]he officer yelled at me as I was taking the steps towards the kitchen archway."

---

[6] Along this same line, Lee argues that Deputy Tucker didn't communicate to him Deputy Tucker's "subjective, unreasonable belief" that "the kitchen was a dangerous place." Br. of Appellee at 7. If it matters, Ms. Lee testified that the block of knives was to the left of the stove. J.A. vol. 5 at 130:16–18.

*Id.* vol. 5 at 136:14–15. According to Lee, the officer's words were "to the effect" of "[d]o not go in the kitchen." *Id.* at 139:6–7. To this, Lee replied with words "to the effect" of, "It's my kitchen, or, It's my house; I can go in my kitchen." *Id.* at 139:11–13. Further, Lee's response brief to this court acknowledges this verbal exchange. *See* Br. of Appellee at 6–7.

Second, the majority adopts the district court's finding of a fact dispute about whether Lee resisted the deputies as they tried to handcuff him. Having done so, the majority rules that the deputies could not repeatedly apply the Taser without warning when Lee "was not resisting the officers and had not been advised that he was being detained." Maj. op. at 9. But to evaluate whether we could correctly say that Lee was not resisting, it helps to review exactly what the district court did and did not say.

The district court certainly did not say that Lee was complying with the officers' attempts to handcuff him. Lee could have complied simply by placing his hands behind his back. And the district court acknowledged that Lee's failure to do so "suggest[ed] that Mr. Lee was non-compliant and resisting arrest." J.A. vol. 17 at 481. But still the district court found a fact issue about whether Lee had "actively resisted" the deputies— apparently meaning whether Lee had "punch[ed], kick[ed], push[ed], or shov[ed]" the deputies during the struggle. *Id.* vol. 16 at 480. The district court decided that a jury could find that Lee didn't resist the deputies so long as it believed Lee's account that he "never fought back or actively resisted the officers." *Id.* vol. 17 at 481. Unmentioned in the majority opinion is the district court's finding that, as Lee sat in the patrol car, Lee announced that had Deputy Tucker not had a badge or Taser, Lee "could have kicked his

9

a\*\*." *Id.* vol. 16 at 463. Also unmentioned is Lee's admitting in his deposition that he might indeed have said that. *Id.* vol. 5 at 142:23–43:5. Lee's combative words in the patrol car help show the difficult situation that the deputies faced—as officers responding in an objectively reasonable way—in trying to handcuff him.

The district court's findings show that Lee physically struggled with the deputies to avoid being handcuffed. To handcuff Lee, the officers needed to break his grip on the refrigerator handle. The district court's distinction between "actively" versus "passively" resisting dissolves into nothing. To the deputies, any talk about whether Lee resisted must seem laughable. Lee's fighting to keep his hands in front of his body qualifies as resistance. Lee could resist without biting, scratching, punching, pinching, kicking, shoving, or the like.

## F. Clearly Established Law

Under the second prong of the qualified-immunity analysis, each deputy would be entitled to summary judgment unless Lee showed that the deputy "violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *al-Kidd* 563 U.S. at 735). "And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 2023 (citing *al Kidd*, 131 S. Ct. at 2083–84). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley*, 475 U.S. at 341). Though the Supreme Court's caselaw

"'do[es] not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White*, 137 S. Ct. at 551 (alteration in original) (quoting *Mullenix*, 136 S. Ct. at 308).

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 136 S. Ct. at 308 (quoting *Saucier*, 533 U.S. at 205). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 309). "The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202).

## G. The Majority's Decision on the Clearly-Established-Law Prong

As I understand the majority, it concludes that the deputies all violated the Fourth Amendment because a deputy "repeatedly appli[ed] a Taser without warning, despite the fact that Lee was not resisting the officers and had not been advised that he was being detained." Maj. op. at 9. I understand the majority to base its excessive-force conclusion on the unwarned repeated Taserings.

As mentioned, the district court concluded that a jury could find that Lee had not resisted if the jury believed that Lee was not "actively resisting" the deputies by assaulting them as they attempted to handcuff him. As a legal matter, the district court

11

concluded that resisting requires assaultive behavior, not simply precipitating a lengthy physical struggle to avoid being handcuffed. I disagree with the majority's characterizing this inquiry as one of fact. Further, even if we assume that a jury could find that Lee was not resisting being handcuffed, we would still need to determine as a legal matter whether the deputies' conduct was objectively reasonable. In the circumstances of this case, no reasonable deputy would suspect that Lee might not be resisting as they physically strained to handcuff him.

Separately, I believe that the district court's findings defeat the majority's view that the repeated Taserings were unrelated to any resistance by Lee. The district court found that "*[b]ecause* Defendants O'Harold, Tucker, and Weiss could not subdue Plaintiff, Defendant Tucker drew his Taser and administered approximately 3-5 'drive stuns' to Plaintiff's back, lasting roughly 3, 5, and 8 seconds." J.A. vol. 16 at 462 (emphasis added). I cannot see how Deputy Tucker's resorting to Tasering Lee to subdue him after other efforts failed would be objectively unreasonable. Would all but plainly incompetent officers know Deputy Tucker's Tasering was excessive force? To prevail on the clearly-established-law prong of qualified immunity, Lee must provide precedent that "squarely governs" the case and puts the answer to the excessive-force question "beyond debate" to show that the deputies' conduct was objectively unreasonable and amounted to excessive force.

As the requisite clearly established law, the majority relies on just one case—
*Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010). Maj. op. at 7. It declares this case "sufficiently analogous" to Lee's to satisfy his burden. *Id.* So Lee's overcoming

12

qualified immunity depends on whether *Cavanaugh* provides clearly established law advising all law-enforcement officers that under the circumstances of this case, Tasering Lee would be excessive force.

In *Cavanaugh*, Mr. Cavanaugh called police about a non-emergency. *Id.* at 662. He sought help finding his wife, who had stormed out of the house after a domestic dispute. *Id.* Mr. Cavanaugh told the officers that his wife had tried to force him into a closet during a fight and that she had earlier consumed alcohol and pain medication. *Id.* at 662–63. He advised the officers that his wife had left the home, carrying a kitchen knife. *Id.* at 663. While the officers were at the house, a neighbor saw Ms. Cavanaugh returning home with empty hands. *Id.* In front of her home, Ms. Cavanaugh approached an officer walking toward her. *Id.* She cut across her front lawn toward her home. *Id.* The officer followed about six feet behind her. *Id.* Ms. Cavanaugh neither acted aggressively toward the officer nor threatened him. *Id.* at 665. Yet as she stepped onto the home's front steps, the officer—without warning—fired his Taser into her back. *Id.* at 663; *see also id.* at 665. She "went rigid, spun around, and struck her head on the concrete steps," causing a traumatic brain injury. *Id.* at 663.

We looked to "whether the officer's use of force was reasonable given the severity of the suspected crime, the immediate threat to the officer or others, and whether the suspect was actively resisting arrest or evading arrest by flight." *Id.* at 664 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In doing so, we concluded that the officer was investigating a minor crime, if any; that Ms. Cavanaugh presented no immediate threat to the officer or anyone else; and that Ms. Cavanaugh had neither actively resisted

13

nor evaded arrest. *Id.* at 665. From those conclusions, we determined that a jury could conclude that the officer had acted with excessive force. *Id.* at 666.

Turning to the clearly-established-law prong, we reviewed our precedent of *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007). *Id.* at 666–67. We found it sufficient that *Casey* had presented "very similar factual circumstances: a police officer used her Taser against a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands." *Id.* at 666 (citing *Casey*, 509 F.3d at 1281–82).

I cannot see how *Cavanaugh* squarely governs Lee's case. Unlike the officer in *Cavanaugh*, the deputies here were locked in a physical struggle with Lee and had exhausted other efforts to handcuff him before Deputy Tucker used a Taser. Unlike the unsuspecting Ms. Cavanaugh, Lee had every reason to believe that the longer he succeeded in resisting the handcuffing, the more likely a deputy would use a Taser. Unlike what happened to Ms. Cavanaugh, Lee's body was not penetrated by fired prongs that left him limp and subject to a brain injury upon falling and hitting concrete steps.

The more appropriate case in guiding our decision on the clearly-established-law prong is *Aldaba v. Pickens* (*Aldaba II*), 844 F.3d 870 (10th Cir. 2016). In that case, law-enforcement officers were called to a hospital "for assistance with a disturbed patient." *Id.* at 875. When the officers arrived, they found Mr. Aldaba walking down the hallway. *Id.* The officers tried to calm him, but he was not in his right mind, claiming that the hospital was trying to kill him. *Id.* After Mr. Aldaba pulled gauze from his arms, a "fairly steady stream of blood" began to flow from each arm. *Id.* The officers ordered Mr.

14

Aldaba to calm down and to get on his knees. *Id.* at 876. Mr. Aldaba refused to do so, even after the officers warned him several times about using a Taser. *Id.* Ultimately, one officer fired a Taser, but just one of the two probes struck Mr. Aldaba. *Id.* Almost immediately after this, the officers physically struggled with Mr. Aldaba, with one officer unsuccessfully trying to use the Taser's drive-stun function to subdue Mr. Aldaba. *Id.* Finally, one officer buckled Mr. Aldaba's knee, sending him and three officers to the floor. *Id.* Almost immediately after that, medical personnel injected Mr. Aldaba with sedatives. *Id.* Within seconds, Aldaba went limp, grunted, and vomited. *Id.* The officers moved away so medical staff could administer CPR. *Id.* This effort failed to revive Mr. Aldaba, and he was soon pronounced dead. *Id.*

Though a year earlier we ruled that the officers *had* violated Mr. Aldaba's clearly established Fourth Amendment rights, *see Aldaba v. Pickens* (*Aldaba I*), 777 F.3d 1148 (10th Cir., *vacated*, 136 S. Ct. 479 (2015) (mem.), we reversed ourselves on our initial clearly-established-law ruling after the Supreme Court vacated that judgment and remanded for our consideration in light of *Mullenix*. *See Aldaba II*, 844 F.3d at 871. The second time around, we rejected the argument that *Cavanaugh* had provided the necessary clearly established law to overcome qualified immunity. *Id.* at 878, 879.

If *Cavanaugh* cannot provide clearly established law sufficient to rule that Tasering a disturbed hospital patient is not excessive force, I don't see how the majority can reach a different result for Deputy Tucker's Tasering Lee during a physical struggle after other efforts to subdue Lee for handcuffing him failed. Though *Aldaba II* was decided two years after Lee's arrest, it surveyed all preceding cases in concluding that no

15

precedent clearly established that all but plainly incompetent officers, or officers knowingly violating the law, would act with excessive force under the Fourth Amendment in Tasering a disturbed hospital patient. The same conclusion should apply for the deputies here in their Tasering an intoxicated, belligerent suspected wife-abuser, ending a dangerous physical struggle by handcuffing him.[7]

---

[7] The majority distinguishes *Aldaba II* on grounds that the law-enforcement officers there warned Mr. Aldaba they would use a Taser unless he submitted. Maj. op. at 8 n.1. But we must remember that Mr. Aldaba was out of his right mind and in poor shape even to understand a warning. 844 F.3d at 874–76. And even if the majority could dismiss *Aldaba II*, the majority's opinion still lacks a "squarely governing" precedent establishing "beyond debate" that Deputy Tucker's Tasering Lee mid-struggle was objectively unreasonable, after the three deputies had been unable to physically subdue him. As spelled out above, the Tasering in *Cavanaugh* involved far different facts.

16